IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

| | |
|---|---|
| CENTRAL GROCERS, INC.,<br>An Illinois Corporation,<br><br>                Plaintiff,<br><br>                v.<br><br>DEAN FOODS COMPANY,<br>A Delaware Corporation,<br><br>                Defendant. | No.<br><br>JURY TRIAL DEMANDED<br>Related to Case No. 2:11-cv-00470 |

## COMPLAINT

NOW COMES Plaintiff, CENTRAL GROCERS, INC. ("CGI" or "Plaintiff"), by its counsel, and for its Complaint against Defendant, DEAN FOODS COMPANY ("DEAN" or "Defendant"), for violating Sections 1 & 2 of the Sherman Act, 15 U.S.C. §§ 1-2, and Section 7 of the Clayton Act, 15 U.S.C. §18, complains as follows:

### I. NATURE OF THE CASE

1. This is a civil antitrust action challenging DEAN's unlawful acquisition of Foremost Farms USA's ("Foremost") Waukesha plant in April, 2009 (the "Acquisition").

2. Foremost is a dairy cooperative owned by approximately 2,300 dairy farms. DEAN is a milk processor that competed with Foremost in the market for the sale of fluid milk at wholesale to distributors, retailers, and others. Through the Acquisition, DEAN acquired a dairy processing plant owned by Foremost located in Waukesha Wisconsin. In doing so, DEAN monopolized the market for the wholesale production and sale of fluid milk in violation of Sections 1 & 2 of the Sherman Act,15 U.S.C. §§ 1-2, until it was forced to divest the Waukesha Plant as a result of a Complaint filed by the United States Department of Justice ("DOJ"). The

1

Acquisition was specifically initiated to remove from the market a competitor with excess plant capacity who was willing to reduce price so as to increase sales and utilize otherwise unused productive capacity. Such a competitor is referred by DEAN as an "irrational competitor." The acquisition of the Foremost Waukesha plant by DEAN constitutes a direct violation of Section 7 of the Clayton Act because "the effect of such acquisition may be substantially to lessen competition." 15 U.S.C. §18.

3. Subsequent to DEAN's acquisition of the Foremost Waukesha plant, the DOJ brought a case against DEAN seeking, among other things, to have the Acquisition declared illegal and to force DEAN to sell the Waukesha plant. While the DOJ's action resulted in DEAN agreeing to dispose of the Waukesha plant, the anticompetitive effects of DEAN's illegal conduct continue to this day.

4. In the time period that has elapsed since DEAN's illegal acquisition of the Foremost Waukesha plant, CGI, a long time DEAN's customer, has been damaged by DEAN's anticompetitive conduct.

5. Prior to the Acquisition, CGI could use competition from Foremost and the potential to extract lower prices from Foremost as negotiating leverage to secure lower fluid milk prices from DEAN.

6. As a result of the Acquisition, CGI could no longer negotiate with DEAN based on Foremost's pricing, and DEAN no longer needed to maintain its fluid milk prices at competitive levels in order to retain CGI's business. As a consequence, DEAN customers such as CGI have been forced to pay higher prices for milk products than they would otherwise have had to pay in the competitive market place that would have existed but for DEAN's illegal conduct.

## II. PARTIES

7. CGI is a corporation organized under the laws of the State of Illinois with its principal place of business located in Joliet, Will County, Illinois. CGI is a cooperative wholesale food distributor to approximately 375 independent retail grocery stores. One of CGI's functions as a cooperative food distributor is to purchase fluid milk for its members. With service to approximately 375 stores, CGI is very high volume fluid milk purchaser.

8. DEAN is a corporation organized under the laws of the State of Delaware with its principal place of business located in Dallas, Texas. DEAN's dairy group is the largest processor and distributor of milk and other dairy products in the United States.

## III. JURISDICTION AND VENUE

9. DEAN and the assets it obtained through the Acquisition of the Foremost Waukesha Plant produce dairy products for sale in interstate commerce. Therefore, DEAN is engaged in activities affecting interstate commerce under Sections 1 and 2 of the Sherman Act, and Section 7 of the Clayton Act. This Court has jurisdiction over this action pursuant to 15 U.S.C. §2, 15 U.S.C. §§15 and 28 U.S.C. §§1331 and 1337(a).

10. Venue is proper in this district pursuant to 15 U.S.C. §§15, 22 and 26 and 28 U.S.C. §1391(b)(2) because DEAN transacts business in this district and a substantial part of the interstate trade and commerce involved and affected by the alleged violations of the antitrust laws was, and is, carried on within this district. Furthermore, the acts complained of have had, and continue to have, substantial anticompetitive effects in this district.

## IV. FACTS

### A. Milk Processing and Pricing in General

11. Dairy processors purchase raw milk from dairy farms and agricultural cooperatives, pasteurize and package the milk, and distribute and sell the processed product at wholesale to distributors, retailers, and others. Fluid milk is raw milk that has been processed for human consumption.

12. Dairy processors supply fluid milk directly to retailers, distributors, broad-line food service companies and institutions such as hospitals and nursing homes. Distributors, such as CGI, then resell the milk that they purchase to small retailers. Retail demand for fluid milk is based directly on consumer demand.

13. Milk processors charge different prices to different purchasers for the same product based on a variety of factors, including the number of competitive alternatives available to the purchaser.

14. Distributors and small retailers generally purchase milk from price lists that dairy processors issue. These customers sometimes obtain rebates, discounts, or other forms of price relief, so that two customers covered by the same price list may pay different prices. Bid prices are based on the processor's product, transportation, service costs, the processor's capacity utilization, and the number and strength of other processors likely to offer competing bids, among other factors.

15. Distance between processors and purchasers is an important consideration in fluid milk pricing because fluid milk has a limited shelf life and is costly to transport. These costs result in most customers purchasing fluid milk from nearby processing plants.

4

### B. DEAN's Acquisition of Foremost

16. The Acquisition is the latest in a series of acquisitions by DEAN of smaller dairy processors across the United States. Since 1996, DEAN has made more than 100 acquisitions which have added to DEAN's market share and increased its size substantially.

17. Foremost is a dairy cooperative headquartered in Baraboo, Wisconsin. Like other agricultural cooperatives, Foremost is a member-owned business association.

18. Prior to the Acquisition, Foremost processed its members' raw milk at its Waukesha plant, as well as other facilities. The Waukesha plant was owned and operated by Foremost's Consumer Products Division. On or about April 1, 2009, DEAN bought substantially all of the Consumer Products Division's assets, including the Waukesha plant, for $35 million.

19. Prior to the Acquisition, while DEAN's fortunes had been rising, the same had not been true of Foremost. In 2006 and 2007, Foremost lost some of its fluid milk customers. Consequently, Foremost was operating at less than two-thirds of its fluid milk capacity, giving Foremost the most excess capacity in Wisconsin and northeastern Illinois[1].

20. Excess capacity creates an incentive to bid more aggressively for fluid milk contracts. Because of its substantial excess capacity, Foremost was pricing aggressively to secure new business. Unlike Foremost, DEAN did not have substantial excess capacity, so it did not have the same economic incentives as Foremost. As a result of Foremost's aggressive pricing, DEAN faced the choice of either losing business to Foremost due to its low price bids or cutting its own prices and margins. Neither approach was attractive to DEAN.

---

[1] For purposes of the Complaint, Northeastern Illinois is defined to include the following counties in the State of Illinois: Cook County, DeKalb County, DuPage County, Grundy County, Kane County, Kendall County, Lake County, McHenry County and Will County.

5

21.     The competitive pressure on DEAN posed by Foremost was not unique. DEAN generally saw competitors such as Foremost with excess capacity as posing a threat to DEAN's profitability. DEAN's Chief Executive Officer, Gregg Engles, articulated the competitive threat facing DEAN in a September 2008 speech to DEAN's top executives:

> "Every one of you has an irrational competitor story. . . . Why do we have irrational local competitors? Because we have too much capacity in this industry . . . . these guys are losing share, . . . they have less volume in their plants, . . . so they default to the same game that gets played in industries that have little volume growth and too much capacity everywhere around the world. People play for share, and in this category, you play for share with price."

22.     DEAN viewed Foremost as one of those "irrational" local competitors because of, among other reasons, Foremost's excess capacity. As alleged by the DOJ in its Complaint against DEAN, in 2008, as part of an effort to develop a strategic growth plan for its fluid milk business, DEAN's corporate headquarters asked its group vice presidents from each region to prioritize their key competitive issues. The Vice President for the North Central region (which includes Wisconsin) identified his key concern as "Midwest excess capacity lies with cooperatives with staying power." Cooperatives, such as Foremost, were competitive threats because the "co-op goal is to move Member milk," and because "their plants are under utilized."

23.     As further alleged by the DOJ, the problem this created for DEAN was obvious. Competition with these cooperatives was predicted to "lower margins and condition clients [to] the benefits of shopping their business." Along with one cooperative in the region, Foremost was identified as a particularly "dangerous" competitor because "they need to add volume to maintain their lo[w] cost strategy." In other words, according to DEAN, Foremost was more

6

willing to accept lower prices for processed fluid milk than DEAN found acceptable and was regarded as a dangerous threat to DEAN's profits.

24. The DOJ also alleged that DEAN proposed other future acquisitions, which included other problematic local processors (i.e. price cutting), as part of its 2008 Strategic Growth Plan. Ed Fugger, DEAN's acquisition chief, highlighted that fragmentation "[d]rives margin compression," and that a significant part of the fluid milk market "remains highly fragmented." In preparation for a speech to DEAN's senior management, and later, DEAN's Board of Directors, Fugger, in handwritten notes, wrote that the "benefit of acquisition in these m[ar]k[e]ts is margin expansion." In other words, by eliminating this fragmentation, DEAN could increase its profits.

25. The Strategic Growth Plan included "Potential Acquisition Targets" for each of DEAN's regions. The targets for the North Central Region included Foremost, which DEAN had identified as one of two "irrational competitors" that are "significantly short on volume."

26. DEAN eliminated the competitive threat and the downward pressure on prices posed by Foremost by acquiring, among other assets, the Waukesha Plant. Any efficiencies DEAN may have hoped to realize from acquiring the Foremost assets did not reverse the anticompetitive impact of eliminating a competitor that DEAN believed, on information and belief, was responsible for the most aggressive pricing it had seen in 40 years.

    **C.    The Relevant Product and Geographic Markets**

*Relevant Product Market*

27. Fluid milk is a relevant product market and line of commerce under Sections 1 and 2 of the Sherman Act and Section 7 of the Clayton Act. Fluid milk is a product with special nutritional characteristics and has no practical substitutes.

7

28. Consumer demand for fluid milk is relatively inelastic, i.e., fluid milk consumption does not decrease significantly in response to a price increase. Demand by retailers, distributors and other purchasers of fluid milk is also inelastic because it is based on consumer demand. As a result, DEAN's monopolist acts relating to fluid milk allowed it to collect a premium over the market price that would have otherwise existed.

*Relevant Geographic Market*

29. Fluid milk processors are able to charge different prices to buyers in different areas, i.e., they can price discriminate. In the presence of price discrimination, relevant geographic markets may be defined by reference to the location of buyers. In particular, a relevant geographic market for fluid milk refers to a region within which purchasers can be targeted for a price increase.

30. Fluid milk purchasers, like CGI, purchase fluid milk from suppliers with processing plants located near them because of the costs associated with transportation and shelf life. For CGI in particular, the geographic region from which it can viably purchase significant quantities of fluid milk, due to the limitations discussed above, is limited to suppliers located in close proximity to Northeastern Illinois where most of CGI's business operations are based. This geographic purchase area constitutes a relevant geographic market under Sections 1 and 2 of the Sherman Act and Section 7 of the Clayton Act (herein referred to as the "the relevant geographic market").

**D.     The Competitive Harm in the Fluid Milk Market**

31. Prior to the Acquisition, Foremost sold virtually all of its fluid milk to purchasers located in the relevant geographic market, northern Wisconsin and the Upper Peninsula of Michigan.

32. As a result of the Acquisition, DEAN was able to charge a higher price for its fluid milk products in the relevant geographic market than it otherwise would have been able to enjoy absent the illegal acquisition of the Foremost assets.

33. This was so because the Acquisition resulted in the reduction of capacity of DEAN's competition in the relevant market and a substantial increase in the concentration of processors who compete to supply fluid milk to purchasers in the relevant geographic market. Indeed, on information and belief, after the Acquisition, DEAN controlled more than 60 percent of all fluid milk sales in Northeastern Illinois, which includes Joliet, where CGI is located, and by acquiring Foremost, removed a key competitor from the relevant market who had excess capacity.

34. The Acquisition was particularly harmful to CGI because, as a high volume milk purchaser, there were very few milk processors within the relevant geographic market that had the capacity to supply CGI's demand, at any price, even before the Acquisition. One of those processors was DEAN – from whom CGI has purchased its fluid milk from for several years - and another was Foremost.

35. As a consequence of the limited number of competitive viable processors to whom CGI could turn to for supply, CGI relied heavily on competitive pressure from Foremost and the other viable processors to keep DEAN's prices at competitive levels.

36. Prior to the Acquisition, CGI would frequently leverage the prices of other viable processors, including Foremost, when negotiating fluid milk prices from DEAN.

37. By way of example, one of CGI's members/customers in Northwest Indiana, Wise Way Foods ("Wise Way"), made its milk purchases through both CGI and directly through various processors, including Foremost. Wise Way would frequently share information with CGI

9

about the fluid milk prices it was getting directly from Foremost and other processors. CGI would then use this pricing information to successfully negotiate with DEAN to secure adjustments in price and keep fluid milk prices low for CGI.

38. Following the Acquisition, DEAN's willingness to exercise market discipline and negotiate with CGI due to the competitive threat of Foremost or others was eliminated.

39. This was a result of no longer having to compete with Foremost, as well as the fact and that there could be easier and more durable coordinated interaction among DEAN and its few remaining viable competitors in the relevant geographic market. DEAN and its few remaining competitors were more likely to decline to bid aggressively for one another's established customers out of concern for retaliation, thereby allocating customers among one another based on a mutual recognition of their respective customer bases.

40. This form of coordination is easier when, as in this case, there are fewer competitors and they can more easily identify one another's customers. For example, CGI has, on numerous occasions, requested a price bid from milk processor Prairie Farms to compete with DEAN, but Prairie Farms has consistently refused CGI's request to bid, apparently due to lack of capacity.

41. DEAN's acquisition of the Waukesha plant caused the price of liquid milk to be higher than it would otherwise have been and, despite DEAN's agreement to divest itself of the Waukesha plant as a result of an action brought by the United States Department of Justice, it is likely to take years for a competitive price to be re-established. In addition, firms currently serving the fluid milk markets in the relevant geographic market are unlikely to expand their service area or presence sufficiently to substantially mitigate the loss of Foremost's head-to-head

competition with DEAN in the fluid milk market or to disrupt coordinated interaction by DEAN and its remaining competitors in the fluid milk market.

## COUNT I
## Unreasonable Restraint of Competition in Violation of §1 of the Sherman Act

42. Plaintiff reallages and incorporates the allegations set forth in Paragraphs 1-41 as its allegations for paragraph 42 as though fully set forth herein.

43. The acquisition of Foremost by DEAN allowed DEAN to obtain and/or augment significant market power within the relevant market as it allowed DEAN to acquire the power to significantly raise the price of fluid milk to purchasers such as CGI without losing sales as a result of the price increase.

44. The Acquisition constitutes a contract that unreasonably restrains competition within the meaning of the rule of reason and violated §1 of the Sherman Act (15 U.S.C. §1) in that:

    a. competition between Foremost and DEAN in the relevant geographic market in the sale of fluid milk was eliminated and unreasonably injured causing prices within the relevant market, including the prices to CGI, to be significantly higher than they otherwise would have been; and

    b. price competition in the relevant geographic market in the sale of fluid milk was substantially lessened.

45. As a direct and proximate result of the unlawful and anticompetitive conduct of DEAN, CGI has and will continue to pay anticompetitively inflated prices for fluid milk, and other dairy related products.

## COUNT II
## Monopolization in Violation of Section 2 of the Sherman Act

46. Plaintiff realleges and incorporates the allegations set forth in Paragraphs 1-45 as its allegations for Paragraph 46 as though fully set forth herein.

47. DEAN possesses monopoly power within the relevant geographic and product market. As a result of the Acquisition, purchasers like CGI cannot turn to other fluid milk producers, who either lack the capacity to produce sufficient quantities or are located too far from CGI's distribution center to realistically provide a perishable product such as fluid milk, to meet their demand. Accordingly, DEAN had and continues to have the power to raise the price of fluid milk in the relevant geographic market without losing sufficient business to make such price increase unprofitable

48. As a result, DEAN unlawfully acquired the power to raise fluid milk prices to supracompetitive monopoly levels unfettered by competitive pressure and completely shielded from the proper functioning of the price mechanism or cross-elasticity of demand.

49. DEAN's monopoly power was willfully obtained and maintained by anticompetitive conduct, namely, the Acquisition, which eliminated any incentive for DEAN to keep fluid milk prices at competitive levels in the relevant geographic market.

50. The Acquisition insured that that no viable competitor, from the standpoint of capacity and distance, could take sales of fluid milk away from DEAN by offering lower prices.

51. DEAN's monopoly power was not achieved by superior skill, business acumen or historic accident.

52. As a direct and proximate result of DEAN's anticompetitive conduct, CGI has been injured in its business or property by being charged supra-competitive, monopoly prices by

DEAN for fluid milk that far exceeded the prices that would have obtained in an unfettered market.

## COUNT III
### Attempt to Monopolize in Violation of Section 2 of the Sherman Act

53. Plaintiff realleges and incorporates the allegations set forth in Paragraphs 1-52 as its allegations for Paragraph 53 as though fully set forth herein.

54. DEAN attempted to obtain an unlawful monopoly power in the relevant fluid milk market.

55. The acquisition of Foremost by DEAN created a dangerous probability that DEAN would obtain monopoly power over the wholesale sale of fluid milk within the relevant market in that DEAN would obtain the power to raise price to purchasers of fluid milk without losing sufficient sales to cause its price increase to be unprofitable.

56. As alleged above, DEAN consummated the Acquisition for the specific anticompetitive purpose and with the specific anticompetitive effect of insulating itself from price competition for fluid milk and obtaining and maintaining monopoly power.

57. As a direct and proximate result of DEAN's anticompetitive conduct, CGI has been injured in its business or property by being charged supra-competitive, monopoly prices by DEAN for fluid milk that far exceeded the prices that would have obtained in an unfettered market.

## COUNT IV
### Unlawful Acquisition in Violation of Section 7 of the Clayton Act

58. CGI realleges and incorporates its allegations in Paragraphs 1 through 57 as its allegations for Paragraph 58 as though fully set forth herein.

13

59. The Acquisition substantially lessened competition in interstate trade and commerce, in violation of Section 7 of the Clayton Act, 15 U.S.C. §18, in that:

   a. actual and potential competition between Foremost and DEAN in the relevant geographic market in the sale of fluid milk was eliminated; and

   b. competition in the relevant geographic market in the sale of fluid milk was substantially lessened.

60. As a direct and proximate result of the unlawful and anticompetitive conduct of DEAN, CGI has and will continue to pay inflated prices for fluid milk, and other dairy related products.

## **RELIEF REQUESTED**

WHEREFORE, CGI respectfully requests that this Honorable Court:

   A. Declare and decree that the Acquisition was unlawful and that DEAN violated the antitrust laws in each of the ways alleged above;

   B. Award CGI damages for the harm it has sustained on account of DEAN's unlawful conduct to CGI in an amount to be trebled in accordance with the antitrust laws pursuant to 15 U.S.C. §15(a);

   C. Award CGI its expenses and costs of prosecuting this action, including reasonable attorneys' fees and experts' fees and costs, to the extent provided by law;

   D. Award CGI pre-judgment and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

   E. Order that DEAN be enjoined from all continuing and future unlawful activity in violation of the antitrust laws; and

   F. Award to CGI all such additional relief as this Honorable Court may deem just

and proper.

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), CENTRAL GROCERS, INC. demands a trial by jury of all of the claims asserted in this Complaint so triable.

DATED: this 18th day of January, 2012.

*/s/ Scott A. Ruksakiati*
Scott A. Ruksakiati, Esq.
(admitted to E.D. WI 11/21/2008)

Joseph M. Vanek, Esq.
Scott A. Ruksakiati, Esq.
David P. Germaine, Esq.
John P. Bjork, Esq.
VANEK, VICKERS & MASINI, P.C.
111 S. Wacker Drive, Suite 4050
Chicago, IL 60606
Tel:   (312) 224-1500
Fax:   (312) 224-1510
jvanek@vaneklaw.com
sruksakiati@vaneklaw.com
dgermaine@vaneklaw.com
jbjork@vaneklaw.com

Paul E. Slater, Esq.
Sperling Slater & Spitz
55 West Monroe Street
Suite 3300
Chicago, Illinois 60603
312-641-3200
312-641-6492 (Fax)
pes@sperling-law.com

Counsel for Plaintiff CENTRAL GROCERS, INC.